# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | Ian H. Levin |
|---|---|---|---|
| **CASE NUMBER** | 97 C 6634 | **DATE** | 7/12/2000 |
| **CASE TITLE** | International Sporthorse Registry I vs. Oldenburger of America Inc | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter report and recommendation recommending that plaintiff's motion for an order to hold in contempt of court the Verband and OHBS and for an order directing compliance be granted in part and denied in part is hereby submitted to Judge Norgle.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 18 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | *DMJ* | **39** |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 7/12/2000 | |
| | | | date mailed notice | |
| SM | courtroom deputy's initials | 00 JUL 17 PM 4:00 | SM | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL SPORTHORSE REGISTRY, INC., | ) ) ) ) | DOCKETED<br>JUL 18 2000 |
| Plaintiff, | ) ) | Case No. 97 C 6634 |
| v. | ) ) ) | Magistrate Judge Ian H. Levin |
| OLDENBURGER OF AMERICA, INC., | ) ) ) | Judge Charles R. Norgle, Sr. |
| Defendant. | ) ) ) | |

TO:   THE HONORABLE CHARLES R. NORGLE, SR.
      UNITED STATES DISTRICT COURT JUDGE

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's Motion for an Order to Hold the Verband and OHBS in

Contempt of Court and for an Order Directing Compliance.  For the reasons set forth below, it is

recommended that Plaintiff's motion be granted in part and denied in part.

### FACTUAL BACKGROUND[1]

### I.   GENERAL BACKGROUND

Plaintiff Verband Der Zuechter Des Oldenburger Pferdes, e.V. (the "Verband") was

created in 1923 pursuant to the horse breeding act.  It has established standards and procedures

for the evaluation, certification, licensing and branding of Oldenburg horses.  The Oldenburg

breed is one of the earliest breeds of German warm-blooded horses, dating back to the sixteenth

---

[1]A portion of the factual background was taken from *Verband Der Zuechter Des
Oldenburger Pferdes, e.V. v. International Sporthorse Registry, Inc.*, 1999 WL 1206640
(N.D.Ill.1999).

century. (Compl. pp. 6-8). The Verband is a recognized breeding association for Oldenburg horses. Since its creation in 1923, the Verband has used its O and CROWN mark (the "Mark") to certify those stallions, mares and foals that have met its standards.

In 1983, a group of independent American breeders and importers of sport horses established International Sporthorse Registry, Inc. ("ISR"), a non-profit corporation, to provide a uniform method and means to evaluate, test, register and measure performance of sport horses. ISR's purpose in establishing a breeding program was to adhere to the standards comparable to those of the Verband. ISR offers a variety of services to members of the equestrian industry, including evaluating the quality and breeding records of sport horses and determining which horses exhibit the breeding background and performance characteristics to be certified as an Oldenburg horse and bear ISR's brand, the O and CROWN design identical to the Verband's mark.

In 1988, the Verband entered into an exclusive licensing agreement with ISR, which authorized ISR to use the Mark in the United States. In 1993, the Verband entered into a new agreement which was, essentially, a renewal of the 1988 agreement with a new provision authorizing the Verband to have access to ISR's registration records. The 1993 agreement made no specific reference to the Mark, nor did it contain a promise by the Verband that ISR would be the exclusive U.S. organization with the authority to evaluate and brand Oldenburg sport horses.

In March 1996, ISR applied to register the Mark in its own name at the United States Patent and Trademark Office, and a trademark was obtained. In May 1996, the Verband, having learned that ISR applied to register the Mark in its own name, gave ISR notice of its intent to terminate the 1993 agreement effective December 31, 1997. In October 1997, the Verband

2

determined that ISR had violated the 1993 agreement by asserting exclusive rights in the Mark. The Verband then terminated the 1993 agreement "effective immediately," and demanded that ISR cancel the trademark registration and cease and desist from using the Mark. The Verband entered into a licensing agreement with Oldenburger of America, Inc. ("OA"), which allowed OA to use the Verband Mark in the United States to certify Oldenburg horses.

## II. THE 1996 ACTION

In April 1996, Oldenburg Studbrook of North America ("OSNA") began to use the Mark in connection with providing evaluation services and certifications of sport horses. In May 1996, after ISR determined that OSNA was using the Mark, ISR filed suit against OSNA and subsequently obtained a temporary restraining order to prevent OSNA's use of the Mark. ISR subsequently determined that OSNA was the same business enterprise as OA, and that the Verband closely controlled OSNA's and OA's activities. Settlement discussions ensued and ISR agreed to dissolve the temporary restraining order and to dismiss the suit against OSNA without prejudice. ISR claimed that it did so on the Verband's representations that it would no longer be affiliated with OSNA and would continue to negotiate in good faith in an effort to resolve the dispute. A formal settlement was never reached.

## III. THE 1997 ACTION

Several months passed without any contact between the parties, until January 1997, when a conversation took place between Ekkehard Brysch, the CEO of ISR, and Dr. Schleppinghoff, the Breeding Director of the Verband. As a result of these communications, ISR believed that OSNA was no longer in business, and had therefore ceased using the Mark.

However, OSNA had in fact continued its existence, but under a new name. In June

1996, OSNA changed its name to Oldenburger of America, Inc. ("OA"). On September 2, 1997, ISR learned that OA had again been using the Mark in connection with the inspection and certification of horses. On September 22, 1997, ISR filed suit against OA claiming federal trademark infringement.

On September 24, 1997, Judge Marovich granted ISR's Motion for a Temporary Restraining Order to prevent OA's unauthorized use of the Mark. The Verband failed to respond to the temporary restraining order, so on October 8, 1997, Judge Marovich entered a Final Judgment and Permanent Injunction by Stipulation which, among other things: (1) confirmed that ISR is the owner of the Mark and has exclusive rights to use and control the Mark in the United States; and (2) permanently enjoined OA, and any person or entity acting in concert or participation with it who has notice of the Final Judgment, from using the Mark or any confusingly similar mark.

## IV. THE 1998 ACTION

On April 24, 1998, the Verband filed an action against ISR to enforce rights that it believed it had in the Mark. On December 13, 1999, District Judge Pallmeyer entered a Memorandum Opinion and Order in which she found, *inter alia*, that "the Verband, through its control over OA, and its direct involvement in the prior lawsuit, did have the opportunity to be heard, and did have sufficient interest in the prior litigation to be bound by the decree. The court therefore finds that privity exists between the Verband and OA...." *Verband*, 1999 WL 12206640 at *12.[2]

---

[2]District Judge Pallmeyer's final judgment for the Defendant ultimately was not appealed. It thus is undisputed, by virtue of Judge Pallmeyer's decision, that the respondents are in privity

4

## ANALYSIS

ISR has moved for an order directing the Verband and OHBS to comply with the Final Judgment and Permanent Injunction.[3] ISR also requests an Order holding the Verband in contempt of Court and an Order Directing Compliance. In support of its Motion, ISR argues that (1) the Verband and OHBS have unlawfully disseminated advertising bearing the Mark; (2) the Verband and OHBS continue to violate the Permanent Injunction by perpetuating OA's infringing acts; and (3) the Verband violated the Permanent Injunction by pursuing a 1998 lawsuit and filing a cancellation action before the United States Trademark Trial and Appeal Board.

### I.    STANDARD OF REVIEW

Civil contempt proceedings arise under 18 U.S.C. § 401(3), which states in pertinent part: "A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as...[d]isobedience or resistence to its lawful writ, process, order, rule, decree, or command." "Before a court may invoke the statute, however, it must be able to cite a decree which 'sets forth in specific detail an unequivocal command' violated by the party in contempt." *McGuffin v. Springfield Housing Authority*, 62 F.Supp. 1546, 1548 (C.D.Ill.1987) (*quoting Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir.1986), *citing H.K.Porter Co. v. National Friction Products*, 568 F.2d 24, 27 (7th Cir.1977)).

---

with OA and bound by the Permanent Injunction herein.

[3]The Verband represents that it has not used the subject Mark in the United States since April 1998, and that, in view of Judge Pallmeyer's judgment, it will not use the Mark in the United States in the future nor will it file future lawsuits in the United States to enforce its rights to the Mark against ISR. (*See* Def. Resp. at 8.)

"The purpose of a civil contempt proceeding is either enforcement of a prior court order or compensation for losses suffered as a result of non-compliance with that order." *Miller v. LeSea Broadcasting, Inc.*, 927 F.Supp. 1148, 1149-50 (E.D.Wis.1996); *See, Commodity Futures Trading Commission v. Premex, Inc.*, 655 F.2d 779, 785 (7th Cir.1981). To hold a party in contempt, the court must be able to point to an order which sets forth a clearly articulated command which the alleged party in contempt has violated. *Miller*, 927 F.Supp. at 1150; *See, Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989).

"A complaining party must prove that the order was violated by 'clear and convincing' evidence." *Able*, 870 F.2d at 1163; *See, e.g., United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir.1985), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985). A party may be found to be in contempt if such party was not reasonably diligent in attempting to accomplish what was ordered. *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 517 (7th Cir.1982) (citation omitted).

## II.  ADVERTISEMENTS PLACED BY THE VERBAND

The Permanent Injunction precludes the Verband and OHBS from "using the Mark or any reproduction, copy or colorable imitation of same in connection with the promotion, advertising, offering to provide and/or providing certifications or related services...." Permanent Injunction, ¶ 3(a).

### A.  *The Chronicle and the Horse* Statement

ISR contends that the Verband placed an advertisement in the November 28, 1997 issue of *The Chronicle of the Horse* publication, which bears an unauthorized reproduction of the Mark and reveals that the Verband, despite the court's Permanent Injunction, intended to act in

concert and/or participation with OA to certify horses in the United States with the Mark. (*See* Pl. Mot. at 9; Brysch Dec. ¶13.) The advertisement in question states, in part, that:

> [t]he Oldenburger of America (Inc.) organization in the United States has received full support from the Oldenburg Verband since it was founded. In spite of allegations to the contrary, it is not planned to disband this organization. Just the opposite, the Oldenburger of America organization will receive even more support from the Verband in the future, also in terms of personnel.

(*See* Pl. Mot. at 9; Ex. 1.)

The Verband maintains that it issued a "press release" to *The Chronicle and the Horse* as opposed to an "advertisement," and that the purpose of the press release was merely to inform breeders that the Verband would continue to service breeders in the United States even though OA was going out of business. The Verband argues that the press release did not show that the Verband intended to act in concert with OA, and that in fact, the Verband has not acted in concert with OA to use the Mark since the Permanent Injunction was entered. (*See* Def. Resp. at 9.) This court disagrees.

The Permanent Injunction specifically provides that OA and any business owned by OA (*i.e.*, the Verband) are permanently enjoined from using the mark in connection with providing the promotion, advertising, offering to provide and/or provide certifications and related services. Permanent Injunction, ¶ 3(a). A plain reading of the statement placed in *The Chronicle of the Horse* publication, with the accompanying display of the Mark, clearly shows that the Verband violated the Permanent Injunction.

### B. The Stallion Roster

ISR also notes that in or about April 1998, it learned that the Verband, through OHBS,[4] was disseminating materials bearing unauthorized reproductions of the Mark.[5] (*See* Pl. Mot. at 9.) It is ISR's position that the dissemination of the Stallion Roster is a further violation of paragraph 3(a) of the Permanent Injunction.

The Verband argues that the Stallion Roster was not prepared by the Verband, but rather by OA on OA's letterhead. Furthermore, according to the Verband, the Stallion Roster was sent to only one person, a woman named Ilona English, who is on ISR's board of directors. (*See* Def. Resp. at 10; Simensen Decl. ¶¶ 3-4.) The Verband explains that the roster was faxed to Ms. English by Holly Simensen, the office manager for OHBS, only two weeks after Ms. Simensen became the office manager for the Verband. *Id.* According to Ms. Simensen's declaration, Ms. English represented that she was interested in breeding that season, and she demanded a copy of the Verband's Stallion Roster. *Id.* Ms. Simensen advised Ms. English that the Verband had not yet compiled its own Stallion Roster, but that it would be available the following week. *Id.* Ms. Simensen offered to provide an oral list of eligible stallions, but Ms. English allegedly would not accept this answer. *Id.* Therefore, Ms. Simensen, allegedly pressured by Ms. English's insistence and rudeness, removed the old OA list from a file cabinet and faxed it to Ms. English. *Id.* That list bore the Mark.

Ms. English's alleged rudeness and Ms. Simensen's inexperience as the Verband office

---

[4]ISR points to the facsimile stamp atop the Stallion Roster, which it alleges is the facsimile number for Mrs. Holly Simensen, office manager for OHBS.

[5]ISR claims that the Verband issued a "Stallion Roster" bearing the Mark, printed on OA letterhead. (*See* Pl. Ex. 3.)

manager do not exonerate the Verband from its responsibilities under the Permanent Injunction.

The Verband does not dispute that the Stallion Roster that it sent unauthorizedly bore the Mark.

The terms of the injunction were clear on their face, and the Verband, through the actions of its

office manager Ms. Simensen, clearly violated its terms. Accordingly, this court concludes that

the Verband did violate the terms of the Permanent Injunction through the Stallion Roster sent by

the Verband to ISR which displayed the Mark.

### III. THE VERAND AND OHBS' USE OF THE MARK

The Permanent Injunction precludes the Verband and OHBS from "using the Mark in any

manner likely to cause others to believe that OA's certifications or related services are connected

with ISR or ISR's certifications provided under the Mark, or are a substitute for ISR's

certifications under the Mark." Permanent Injunction, ¶ 3(b).

It is ISR's contention that by wrongfully branding and certifying horses which have not

been inspected according to ISR's strict standards, OA misled breeders into believing that their

foals, mares and stallions have certain valuable characteristics, which they do not. ISR goes on

to argue that by continuing to honor OA's wrongfully issued certification papers and dealing

with U.S. breeders as if OA's certification was/is valid, the Verband and OHBS are perpetuating

the wrongful and unlawful use of the Mark. (*See* Pl. Mot. at 10.)

In early 1998, the Verband requested from OA, and OA provided to the Verband,

pedigree and inspection papers for the horses which had been inspected by OA in 1996 and 1997.

*Id.* By acquiring these papers, ISR argues, the Verband replaced OA and continued its activities

in North America as if OA still existed. *Id.*

In May 1998, the Verband, in an issue of *Dressage and Combined Training* magazine,

9

confirmed its intent to honor the certifications wrongfully issued by OA through OA's infringing use of the Mark with the following letter: "[Pedigree certificates] issued by Oldenburger of America remain valid, and therefore no new papers will be issued for these horses."

It is the position of the Verband that its admitted continuation of the honoring of the certificates issued by OA is not a violation of the Permanent Injunction. According to the Verband, these certificates and certifications were prepared and issued by OA during its 1996 and 1997 inspection seasons, and were not prepared by the Verband. (*See* Def. Resp. at 11.) The Verband maintains that OA transferred the certificates after it ceased operations and that the Verband honored the certificates by accepting horses branded by OA when it was a licensee of the Verband onto the Verband's registry without reinspection. *Id.* Thus, concludes the Verband, OA's use of the Mark was not a violation of the Permanent Injunction at the time it issued the certificates, and since the Permanent Injunction was entered, the Verband itself has issued no paperwork bearing the Mark to U.S. breeders. *Id.* This court disagrees.

As the owner of the Mark, ISR is the only party who can authorize its use in the United States in connection with the inspection, branding or certification of horses, or any other related services. ISR correctly points out that the certificates that the Verband transferred to OA in 1996 and 1997 were not valid, as OA was not authorized to issue any rights in and to the mark at the time it issued said certificates. ISR correctly points out that the Verband's honoring of the unlawfully issued certificates causes breeders to believe that OA's certifications were, in fact, lawfully issued by ISR because the certificates bear the Mark. (*See* Pl. Resp. at 4.) Thus, breeders are likely to believe that OA's wrongfully issued certificates are substitutes for ISR's certificates. *Id.*

10

In this regard, Dr. Evelin Volstedt, the General Manager of the Verban, essentially admitted the above in her declaration. Specifically, Dr. Volstedt's declaration states:

> The Verband has *honored* certificates issued by OA during its 1996 and 1997 inspections. In doing so, the Verband has accepted for entry into its registry in Germany horses that were inspected, branded and certified by OA during those seasons, *without requiring these horses to be reinspected by the Verband.*

(*See* Def. Resp. Ex. F, ¶ 5) (emphasis added)

In other words, the Verband admits that it is substituting its own certifications for OA's unlawful certification without independently verifying that the horses have any qualifications. Dr. Volstedt further admits that those horses that met the Verband's (and not ISR's) breeding rules were branded with the Mark and owners of those horses were issued certificates bearing the Mark (*See* Def. Resp. Ex. F., ¶ 4). Therefore, breeders in the United States that own horses that bear the Mark and have corresponding OA-issued certificates bearing the Mark do not know that the brand and certificates were invalid because neither the Verband nor OSNA/OA were authorized to use the Mark in the United States. Moreover, as it stands, as a result of the Verband's conduct, breeders who, in the future, purchase a horse that has been branded and has certification papers that bear the Mark will be unable to determine whether their horse(s) was inspected by ISR or according to ISR's standards.

In view of the foregoing, the court finds that the respondents are unlawfully honoring OA's certificates bearing the Mark. Permanent Injunction, ¶ 3(b).

## IV.    THE VIRGINIA LAWSUIT AND THE CANCELLATION ACTION

ISR's final argument is that when the Verband filed a lawsuit in Virginia in 1998, pursued the lawsuit in Illinois and filed a cancellation action before the United States Trademark

11

Trial and Appeal Board ("TTAB") challenging IRS's rights in and to the Mark, it violated

paragraph 3(d) of the Permanent Injunction. Paragraph 3(d) precludes the Verband and OHBS

from "making false statements or other false or deceptively misleading representations of fact or

otherwise about ISR, OA or their respective businesses."

It is ISR's position that the Verband had full knowledge of ISR's rights in the Mark based

on the fact that: (1) IRS was awarded the U.S. Trademark Registration for the Mark; (2) the

Verband participated in a settlement conference with ISR after a temporary restraining order was

issued against the Verband's U.S. representative; and (3) the Verband received the Permanent

Injunction entered against its U.S. representative, which stated that the Mark was owned

exclusively by ISR. Judge Pallmeyer's opinion also made it clear that the Verband should have

sought to intervene in the dispute between ISR and OA.

Nevertheless, argues ISR, when the Verband finally decided to sue ISR, it did so in

Virginia, despite alleged knowledge that this court was to have continuing jurisdiction. The

Verband also filed a cancellation action before the TTAB which, according to ISR, cost ISR

considerable time and money. ISR concluded that these actions were undertaken solely for the

purpose of harassing ISR and the actions clearly violated the Permanent Injunction, and that as a

result, the Verband should be held in contempt of court. This court disagrees.

The Verband contends that it filed a lawsuit against ISR in good faith, believing that it

was not in privity with OA and thus not bound by the Permanent Injunction herein. The Verband

argues that the question of privity was far from clear, as evidenced by the extensive discovery

granted by Judge Pallmeyer prior to her 28-page opinion on the very issue of privity. The court

agrees with the Verband's argument that if the Verband were held in contempt for filing a

lawsuit based on its good faith beliefs regarding the issue of privity, a chilling effect might take place, thereby deterring plaintiffs from filing actions they would otherwise be entitled to bring.

The record reflects that the privity issue was hotly litigated before District Judge Pallmeyer. In the relevant circumstances, the court is satisfied that the Verband did not file its case in Virginia and its cancellation action before the TTAB for the sole purpose of harassing ISR, and that the Verband did have a good faith belief that it was not in privity with OA.

## CONCLUSION

In view of the foregoing, it is hereby recommended that Plaintiff's Motion for an Order to Hold the Verband and OHBS in Contempt of Court and for an Order Directing Compliance be granted in part and denied in part.

Specifically, it is recommended that an order be issued directing the Verband and OHBS to comply with the Final Judgment and Permanent Injunction.

It is further recommended that a finding of contempt be entered and the respondents be ordered to comply with the following:

(1) Return all originals and copies (including electronic copies) of pedigree papers and registration certificates relating to inspections conducted in 1996 and 1997 by OSNA, OA or the Verband covered by the Permanent Injunction in this matter;

(2) Withdraw from its registry all horses branded and certified with the Mark in the United States by OSNA, OA or the Verband in 1996 and 1997;

(3) Provide appropriate written notification to breeders that the certificates issued by OSNA, OA and the Verband in 1996 and 1997 were unlawfully issued, and that the opportunity to have their horses reinspected by ISR exists; and

13

(4) Pay for an advertisement in *The Chronicle of the Horse* publication that is equal in size and placement as the advertisement wrongfully placed by the Verband in the November 27, 1997 issue.

It is further recommended that the respondents not be held in contempt for filing the Virginia lawsuit and the cancellation action before the TTAB.[6]

RESPECTFULLY SUBMITTED,

IAN H. LEVIN
**United States Magistrate Judge**

Dated: July 12, 2000

---

[6]The court also recommends that Plaintiff's request for a $5,000 contempt sanction and the award of its attorneys' fees incurred in the case before District Judge Pallmeyer be denied. A substantial part of the culpable conduct preceded Judge Pallmeyer's findings that respondents were bound by the Permanent Injunction. The case before Judge Pallmeyer was heavily litigated. Until Judge Pallmeyer's judgment it thus was not clear that respondents were bound by the injunction here. Under these circumstances, the court, in its discretion, does not find sufficient culpability to warrant imposition of a monetary sanction, in addition to the sanctions herein ordered. Finally, the court deems that attorneys' fees engendered in a separate case are not appropriate to be considered or awarded herein.